UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHRISTOPHER ROBINSON | : | CIVIL ACTION NO. 3:02CV1470(CFD) |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| ROSETTA JONES, | : | |
| *Defendant* | : | OCTOBER 13, 2004 |

## DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT

1. The plaintiff, Christopher Robinson was born on March 2, 1969, graduated from Putman High School in June of 1988 and commenced employment with the State of Connecticut, Department of Correction that same year, in November of 1988. Exhibit 1, Deposition of Christopher Robinson, dated July 9, 2004, at p. 16; Deposition Exhibit 3A at p. 1.[1]

2. At all times relevant hereto, plaintiff was employed by the Department of Correction as a Correction Officer ("CO") assigned to the Brooklyn Correctional Institute ("BCI") in Brooklyn, Connecticut. Complaint, ¶ 2.

3. The defendant, Rosetta Jones, was at all times relevant to the Complaint, the Warden at BCI. Complaint, ¶ 3. Plaintiff sues the defendant Jones in this action in her individual capacity only. Complaint, ¶ 4.

---

[1] Due to the voluminous page citations, the defendant has submitted plaintiff's entire deposition transcript herewith. Reference to "Dep. at p. ___" represents a reference to plaintiff's deposition transcript. Reference to "Dep. Ex. ____", represents reference to the corresponding exhibit introduced at plaintiff's deposition. These exhibits are also submitted.

4.      Plaintiff worked at BCI from 1992 until March 7, 2001, plaintiff's last day of active work as a CO.  Dep. at pp. 20-24.

5.      In 1996, while checking fire extinguishers in the course of his employment at BCI, plaintiff sat on a broken chair and fell breaking his fall with his left arm/shoulder.  Dep. at p. 19.  As a result, plaintiff underwent left shoulder surgery from which he fully recovered.  Dep. at pp. 19, 20.

6.      At some point in 2001, plaintiff sustained a re-injury to his left shoulder which necessitated a second surgery.  Dep. at p. 20.  Six weeks after the second surgery, plaintiff tore the left shoulder muscle again as a result of physical therapy and other physical stresses which necessitated a third surgery.  Id.

7.      After his third surgery, plaintiff's doctors advised him to commence seeking other employment.  Id.  After encountering additional problems, plaintiff underwent a fourth surgery on his left shoulder/arm.  Id.

8.      After March 7, 2001, plaintiff was totally disabled from work for a length of time and then could have returned to work only in a "light duty" capacity.  Dep. at p. 25.

9.      At some point after March 7 of 2001, plaintiff filed his disability retirement application with the State Retirement Board which was reviewed by the Medical Review Board.  Id.  Plaintiff's disability retirement application was approved on or about February 11, 2004.  Dep. at p. 25.

10.     Plaintiff commenced pre-nursing degree studies at Three Rivers Community College in Norwich, Connecticut in the winter of 2003.  Dep. at pp. 18, 25.  Plaintiff is currently employed part-time as an Emergency Medical Technician ("EMT") with American Ambulance, Inc.  Dep. at pp. 26, 27.

11. At BCI, Correction Officers (CO's) such as plaintiff were directly supervised by lieutenants. Dep. at p. 60. The lieutenants were directly supervised by Captains. Id. The Captains were directly supervised by Deputy Wardens and/or Majors. Id. at p. 61. The Warden is the chief administrator at a prison facility. Id. at p. 62. Defendant Jones was directly supervised by Complex Warden Brian Murphy. Id. at pp. 64, 65.

12. At some point during the Rowland-Kennelly gubernatorial campaign, plaintiff affixed a political bumper sticker on the state car that was driven by Complex Warden Murphy as a joke. Dep. at pp. 72-76.

13. Murphy thereafter convened a meeting at which plaintiff, defendant, Murphy and Jim Owens, plaintiff's union representative, were present. Dep. at pp. 72-73.

14. At the meeting, plaintiff admitted to Murphy that he had affixed the bumper sticker as a joke and Murphy advised Warden Jones that the bumper sticker incident was a "dead issue." Dep. at p. 73.

15. At some point prior to October 9, 1998, plaintiff was selected to a regional Confined Space Rescue Team comprised of Correction Officers which was formed to stand-by and provide protection to maintenance workers who had to enter confined space (inmate areas) in one of the regional correctional facilities. Complaint, ¶ 7; Dep. at pp. 52-53. There was no increase in plaintiff's pay associated with his membership on the Confined Space Rescue Team ("CSRT"). Id. CO membership on the CSRT was not governed by the provisions of the Collective Bargaining Agreement. Dep. at p. 213. Members of the CSRT were held to a higher standard of conduct. Dep. at p. 38.

16. In or about October of 1998, Warden Jones decided not to reassign plaintiff to the Confined Space Rescue Team because of plaintiff's absenteeism in the

prior year which created uncertainty as to plaintiff's availability to serve on the CSRT. Dep. Ex. 4. Warden Jones advised plaintiff in October of 1998, that she would review plaintiff's attendance in six (6) months and reconsider, if there was improvement in his attendance. Dep. at pp. 65-71; Dep. Ex. 4.

17. Thereafter, plaintiff strove to improve his attendance at work and was subsequently appointed to the CERT, a regional emergency response team. Dep. at p. 192; Dep. at p. 37.

18. Plaintiff's union filed a grievance on his behalf relative to his non-reassignment to the CSRT and thereafter a hearing officer determined that approximately thirty (30) of the plaintiff's thirty eight (38) absences were "approved" vacation days or vacation swaps and plaintiff was reinstated to the CSRT. Dep. Tr. at pp. 70, 76-82.

19. On or about March 2, 2000, plaintiff engaged in a discussion with CO Paul Frechette, a union steward, in the lobby of the Officer's Mess/Roll Call room at BCI. Dep. at pp. 84, 85. Shortly thereafter, Captain McNally approached plaintiff and stated words to the effect: I thought you were a straight up guy. Why were you schooled by Frechette? That doesn't look good. Complaint, ¶ 8, Dep. at p. 85.

20. Plaintiff advised Frechette of McNally's remarks and Frechette, on March 3, 2000 filed a grievance on plaintiff's behalf. Dep. Ex. 7; Dep. at pp. 86, 87. A review/investigation of the circumstances surrounding Frechette's grievance was undertaken by Deputy Warden Lebuis who determined that McNally made the remark to plaintiff in the context of mentor/mentee with no intent to coerce. Id.

21. On August 8, 2000, while on duty at BCI, plaintiff became aware of a hazardous condition involving bags of empty plastic soda bottles in a closet, where exterior light switches were located, off the support corridor. Complaint, ¶ 9; Dep. at pp. 87-90. Plaintiff advised Lieutenant Bell, the Lieutenant on duty at the time, of the soda

4

bottles in the closet.  Id., Dep. at pp. 88-89.  At that time, Lt. Bell advised plaintiff to leave the bottles where they were until [Lieutenant Bell] had a chance to find out what to do with them.  Id.

      22.    On August 12, 2000, plaintiff went into the closet, fell on the bottles and bruised his knee.  Dep. at p. 90.  Plaintiff filed an Incident Report in which he included his prior conversation with Lt. Bell on August 8, 2000 concerning the bottles.  Dep. at p. 92.

      23.    Lt. Lalumiere, upon review of the plaintiff's Incident Report concerning the August 12, 2000 slip and fall, directed plaintiff to delete reference to his August 8, 2000 conversation with Lt. Bell.  Dep. at p. 93.  Plaintiff refused to delete the reference.  Id.

      24.    Lt. Lalumiere thereupon "wrote plaintiff up" for refusing to delete the reference to the August 8, 2000 conversation with Lt. Bell in his August 12, 2000 Incident Report.  Dep. at p. 93.  Plaintiff received a letter of counseling in connection with his refusal to amend his August 12, 2000 Incident Report and his attempt to supersede Lieutenant Lalumiere's authority which was signed by defendant Jones.  Dep. Ex. 10.  On or about October 2, 2000, Major Daniel Martin advised plaintiff that this formal counseling letter had been reduced to an oral discussion and the letter removed from plaintiff's personnel file.  Dep. Ex. 11; Depo. at pp. 95, 96.

      25.    On August 26, 2000, plaintiff felt that Lt. Lalumiere spoke harshly to him in front of another CO, CO Shabenas, when Lalumiere observed plaintiff coming out of a secure door.  Dep. at pp. 97-98; Dep. Exh. 5.  Lt. Lalumiere was at that the time questioning plaintiff's presence on the Mezzanine.  Id.

26. On September 5, 2000, Lt. Phaia questioned plaintiff as to why the BCI barbershop was not being opened. Dep. at pp. 100-101; Dep., Exh. 6. Plaintiff felt that Lt. Lalumiere and Lt. Phaia were harassing him. Id.

27. On both the August 26, 2000 and September 5, 2000 occasions, plaintiff refused to continue to respond to his Lieutenant's questions without a union representative present because of his feeling that that the conversation would eventually lead to discipline for him. Dep. at pp. 105-106.

28. As a result of circumstances surrounding plaintiff's refusal to continue discussion without a union representative on August 26, 2000 (Lt. Lalumiere) and September 5, 2000 (Lt. Phaia) plaintiff was, on September 22, 2000, issued notice of a Loudermill conference to be convened on September 27, 2000 for inappropriate conduct with supervisors. Dep. Ex. 8; Dep. at p. 113. The notice of Loudermill meeting was signed by Major Daniel Martin for Rose Jones, Warden. Id.

29. Because plaintiff had been issued a Loudermill notice on September 22, 2000, he was suspended from the Tactical Operations Unit, District #III CERT, since he failed to meet the criteria for membership on the CERT due to pending discipline pursuant to Department of Correction, Administrative Directive, 7.4 Emergency Response Units, and Section 8. Dep. Ex. 12, 13; Dep. at p. 110.

30. Plaintiff, on November 3, 2000, was issued a written reprimand by Dep. Warden David Martin as a result of the incident involving his refusal to answer Lt. Lalumiere's and Lt. Phaia's questions on August 26 and September 5, 2000 respectively. The written reprimand cited plaintiff's abrupt and disrespectful demeanor and advised plaintiff that correctional supervisors need to be informed of the current status of facility staff and inmates at all times to provide for safety and security of the facility and further cited plaintiff's violation of Administrative Directive 2.17. Dep. Exh. 9.

31.     Because of the written reprimand issued on November 3, 2000 as a result of the "insubordination" incidents with Lts. Lalumiere and Phaia, plaintiff was removed from the District III CERT Team and blocked from applying to other special teams including the K-9 Team, Honor Guard and Special Operations Team. Dep. at pp. 110, 111.

32.     Plaintiff filed a grievance relative to the November 3, 2000 written reprimand and was advised during the grievance process that he could reapply to the CERT team and Canine (K-9) Unit, Special Operations and Honor Guard after waiting a year with no intervening disciplinary issues. Dep. Tr. at pp. 110-113.

33.     On or about January 11, 2001 an inmate at BCI filed an Inmate Request Form (Complaint) in which he alleged that the plaintiff had used sexual innuendo to make him feel uncomfortable while they were alone in the inmate's cell on January 10, 2001. Dep. Ex. 14 (Attachment). On January 11, 2001, Trooper Deptula of the Connecticut State Police was assigned by his desk officer to investigate the inmate's complaint of sexual harassment by a CO. Id. p. 2 of 7. At the time of his interview, the inmate also stated to Trooper Deptula that plaintiff had used racially derogatory language during the incident. Id.

34.     After interviewing the inmate and reviewing relevant statutes, Trooper Deptula advised Captain Hadley of BCI that the incident as described by the inmate was not criminal in nature and that he would be interviewing plaintiff to obtain plaintiff's version of the incident. Id. at p 3 of 7.

35.     On January 17, 2001 Trooper Deptula was contacted by plaintiff because plaintiff had heard rumors that he was being investigated for rape of an inmate. Id. at p. 3 of 7. Trooper Deptula advised plaintiff that that was not the allegations. Id. After Trooper Deptula went to BCI on January 17, 2001 he met with Major Martin and

7

Lieutenant Phaia, medical unit personnel, another inmate and plaintiff. Id. at pp. 3 of 7 through 6 of 7.

36.   After concluding all interviews on January 17, 2001, Trooper Deptula met again with Major Martin who contacted defendant Jones to attend their conversation. At that time, Trooper Deptula advised Martin and Jones that he would not be pursuing the matter criminally and would so advise the complaining inmate. Id. p. 6 of 6. Deptula reduced his report to writing on January 22, 2001. Id.

37.   The plaintiff was exonerated from any criminal wrongdoing by the Connecticut State Police investigation and was not contacted by Department of Correction representatives in conjunction with an Affirmative Action Unit investigation of the inmate's harassment charges. Dep. at p. 161. Plaintiff had been directed to write an Incident Report concerning the inmate's allegations and provide it to the Affirmative Action Unit by Captain McNally. Id.

38.   On or about January 3, 2001, plaintiff was assaulted by an inmate as the inmate was leaving the dorm at BCI. Dep. at p. 152. Specifically, the inmate gave plaintiff a "stiff shoulder" while pushing the plaintiff out of his way. Id. Plaintiff did not immediately write an Incident Report. Id. When the plaintiff did forward an Incident Report to the Lieutenant's office he was cited for failure to file a report in a timely manner. Id. Subsequently, the alleged infraction was dropped and never preceded to discipline. Id.

39.   On or about October 30, 2000 plaintiff was confronted by a co-worker, Counselor Leicester who he had earlier reported as being unauthorized in the Control Center. Dep. at pp. 31, 187. Thereafter Counselor Leicester verbally assaulted plaintiff in the roll call room and placed the plaintiff in fear for his safety. Dep. at p. 32. As a result of Counselor Leicester's confrontation, plaintiff utilized 22 sick days. Dep. at p.

31. Plaintiff believes that he was disparately treated from Counselor Leicester. Dep. at pp. 187-190; Dep. Ex. 3A at p. 9. Plaintiff does not know if Counselor Leicester was disciplined for his confrontation of plaintiff. Dep. at p. 188.

40. In order to maintain membership on a Department of Correction special team (CSRT; CERT; K-9; SOG) a CO may not have discipline in his file. Dep. at pp. 39, 40.

41. The plaintiff alleged that the defendant instructed Lt. Lalumiere to harass and verbally abuse plaintiff relative to the August 26 and September 5 incidents upon his "information and belief." Dep. Ex. 3A at p. 5.

42. Plaintiff left BCI and active CO work on March 7, 2001 as a result of his left shoulder injury. Id.

DEFENDANT
ROSETTA JONES

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Eric Horan, Law Student Intern
Office of the Attorney General and

Edward F. Osswalt
Assistant Attorney General
Federal Bar No. ct15252
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel.: (860) 808-5340
Fax: (860) 808-5383
E-mail: Edward.Osswalt@po.state.ct.us

## **CERTIFICATION**

I hereby certify that the foregoing Defendant's Local Rule 56(a)(1) Statement was mailed first class, postage pre-paid, on this 13th day of October, 2004 to the following:

John Williams, Esq.
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT  06510
Tel.: (203) 562-9931
Fax: (203) 776-9494

_____
Edward F. Osswalt
Assistant Attorney General